UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

DAVID WADE,                          )
                                     )
                Plaintiff,           )
                                     )
       v.                            )    No. 4:12CV1143 FRB
                                     )
CAROLYN W. COLVIN, Acting            )
Commissioner of Social Security,[1]  )
                                     )
                Defendant.           )

**MEMORANDUM AND ORDER**

This cause is before the Court on plaintiff's appeal of
an adverse decision by the Social Security Administration.  All
matters are pending before the undersigned United States Magistrate
Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

**I.  Procedural History**

On February 2, 2010, plaintiff David Wade filed an
application for Disability Insurance Benefits pursuant to Title II
of the Social Security Act, 42 U.S.C. §§ 401, et seq., in which he
claimed he became disabled on December 31, 2006.  On initial
consideration, the Social Security Administration denied
plaintiff's claim for benefits.  (Tr. 135-37, 84, 85-89.)  At
plaintiff's request, a hearing was held on May 18, 2011, before an
Administrative Law Judge (ALJ) at which plaintiff and a vocational

---

[1]On February 14, 2013, Carolyn W. Colvin became the Acting
Commissioner of Social Security.  Pursuant to Fed. R. Civ. P.
25(d), Carolyn W. Colvin is therefore automatically substituted
for former Commissioner Michael J. Astrue as defendant in this
cause of action.

expert testified.  (Tr. 36–77.)  On June 14, 2011, the ALJ entered a decision denying plaintiff's claim for benefits, finding vocational expert testimony to support a determination that plaintiff was able to perform other work as it exists in significant numbers in the national economy.  (Tr. 7–23.)  On April 26, 2012, the Appeals Council denied plaintiff's request for review of the ALJ's decision.  (Tr. 1–5.)  The ALJ's decision is thus the final decision of the Commissioner. 42 U.S.C. § 405(g).

In the instant appeal for judicial review, plaintiff claims that the Commissioner's final decision is not supported by substantial evidence on the record as a whole.  Specifically, plaintiff contends that the ALJ erred by failing to consider plaintiff's diagnosed condition of carpal tunnel syndrome to be a severe impairment.  Plaintiff also claims that the record is devoid of any medical opinion supporting the limitations set out by the ALJ in his residual functional capacity (RFC) determination. Finally, plaintiff argues that, because the ALJ's RFC determination is not supported by substantial evidence, the hypothetical question posed to the vocational expert was flawed and did not include all of plaintiff's limitations, and thus that the ALJ erred by relying on vocational expert testimony to find plaintiff not disabled. Plaintiff requests that the Commissioner's decision be reversed and that benefits be awarded, or that the matter be remanded to the Commissioner for further proceedings.

- 2 -

Because the ALJ erred in failing to consider plaintiff's carpal tunnel syndrome to be a severe impairment, it cannot be said that the ALJ's decision is supported by substantial evidence on the record as a whole and the matter should be remanded to the Commissioner for further proceedings.[2]

## II.   Testimonial Evidence Before the ALJ

A.   <u>Plaintiff's Testimony</u>

At the hearing on May 18, 2011, plaintiff testified in response to questions posed by counsel and the ALJ.

At the time of the hearing, plaintiff was forty-six years of age.  Plaintiff stands five feet, seven inches tall and weighs 165 pounds.  Plaintiff is right-handed.  Plaintiff graduated from high school and attended a community college.  (Tr. 40-41.) Plaintiff had previously been in the military and most recently served a four-year tour of duty beginning in 1999.  (Tr. 42.) Plaintiff lives in a house with his wife and three school-aged children.  (Tr. 51.)  Plaintiff testified that he currently receives $1,219.00 per month in compensation from the Department of Veterans Affairs.  (Tr. 56.)

Plaintiff's Work History Report shows that plaintiff

---

[2]A review of the record in its entirety shows the ALJ to have erred in finding plaintiff's carpal tunnel syndrome not to constitute a severe impairment.  Although the undersigned has reviewed the record as a whole, the summary of evidence included in this Memorandum and Order contains only that evidence relevant to this determination of error.

worked as a home health aide from 1995 to 1998 and as a recreation coach from 1995 to 1999.   From 1999 to 2003, plaintiff was a secretary specialist with the United States Army.   From 2004 to December 2006, plaintiff worked as a laborer for the City of Kirkwood.  (Tr. 179.)   Plaintiff testified that he quit his job with the City of Kirkwood on December 31, 2006, because he was unable to perform the duties required of him subsequent to carpal tunnel surgery.  (Tr. 45-47.)   Plaintiff testified that he has sought no other employment nor attempted self-employment since he stopped working for Kirkwood.  (Tr. 48.)

Plaintiff testified that he injured his left arm and both hands during his course of employment as a laborer with the City of Kirkwood, and that the injuries began affecting him on August 8, 2005.  (Tr. 43-45.)   Plaintiff testified that he began wearing braces for carpal tunnel syndrome in 2005 and continued to wear them currently despite having had bilateral carpal tunnel surgery in November 2006.  (Tr. 46-48.)   Plaintiff testified that he participated in physical therapy subsequent to the surgery but needed the braces again beginning in March 2007.   Plaintiff testified that the braces help his pain when he is driving or lifting, and that he experiences pain in his wrists and hands when he is not wearing the braces.  (Tr. 49-50.)   Plaintiff testified that he continues to experience pain and numbness in his hands and that he loses grip in both hands because of shooting pain.

- 4 -

Plaintiff testified that he can use utensils but that his wife helps him with buttons. (Tr. 63-64.) Plaintiff testified that his doctor told him there was not much that could be done regarding his carpal tunnel complaints inasmuch as he already had surgery for the condition. (Tr. 65.)

Plaintiff testified that he also has back pain and pain in both ankles. (Tr. 50.) Plaintiff testified that he currently uses a cane on account of his back pain to help him with mobility and that his doctor provided the cane to him in 2005. Plaintiff testified that he has also used a back brace for his back condition. (Tr. 54-55.) Plaintiff testified that he takes pain medication daily and that his medication makes him feel fatigued and groggy. Plaintiff testified that he has fallen in the past on account of such effects. (Tr. 53-54, 59.) Plaintiff testified that he lies down up to forty percent of the day because of back pain and the fatigue he experiences when he takes his pain medication. (Tr. 66.)

Plaintiff testified that he often experiences chest pain and that aggravation, any type of confrontation, or anything that is "too physical" precipitates the pain. (Tr. 62-63.) Plaintiff testified that he takes nitroglycerin which relieves the pain. (Tr. 50-51.) Plaintiff testified that he gets headaches from the nitroglycerin and must lie down for fifteen to twenty minutes until the effects wane. (Tr. 62.)

- 5 -

Plaintiff testified that he sees a psychiatrist because of auditory hallucinations and because of depression. Plaintiff testified that he takes medication which controls the hallucinations. (Tr. 50, 60-61.)

As to his exertional abilities, plaintiff testified that he can lift up to fifteen pounds but that he loses his grip on account of pain in his hands. (Tr. 52.) Plaintiff testified that he can stand with a cane for about ten minutes before starting to feel pain in his back and knees. Plaintiff testified that he can sit for about thirty minutes before needing to get up and be mobile. Plaintiff testified that he can walk with a cane for about fifteen to twenty minutes. (Tr. 57-58, 65.)

As to his daily activities, plaintiff testified that he reads, performs light household tasks such as laundry, walks outside, and helps his wife perform light duties in the garden such as scattering seeds. Plaintiff testified that he no longer mows the lawn. Plaintiff testified that he does some cooking and may occasionally vacuum. Plaintiff testified that he accompanies his wife while she shops and that he carries light groceries. (Tr. 52-53, 56-57.) Plaintiff testified that he tries to stay active by sometimes accompanying his son to karate class twice a week and by volunteering as a boxing coach. (Tr. 59, 67.) Plaintiff testified that he helps his wife as she home schools their three children. (Tr. 67-68.) Plaintiff testified that he has a commercial driver's

license.  (Tr. 44.)

B.    Testimony of Vocational Expert

Dr. John F. McGowan, a vocational expert, testified at the hearing in response to questions posed by the ALJ and counsel.

Dr. McGowan classified plaintiff's past relevant work as a recreation coach as light and skilled; as a secretary specialist in the Army as light and semi-skilled; as a general laborer as heavy; and as a home health aide as medium and semi-skilled.  (Tr. 70-72.)

The ALJ asked Dr. McGowan to consider an individual of plaintiff's age, education and work experience and to assume the individual to be "limited to light work not requiring more than occasional climbing of stairs.  The person should never climb ladders, ropes, or scaffolding." (Tr. 72.)  Dr. McGowan testified that such a person could perform plaintiff's past work as a secretary specialist in the civilian sector as well as other work in the national economy such as hospital products assembly, of which 1,500 such jobs exist in the St. Louis area and 288,480 nationally; small parts assembler, of which 3,900 such jobs exist in the St. Louis area and 345,000 nationally; and cashiering, of which 4,100 such jobs exist in the St. Louis area and 1.4 million nationally.  Mr. McGowan testified that if such a person were limited to primarily working with things rather than people, the job of cashiering would be eliminated but that such a person could

- 7 -

perform the job of packer/inspector, of which 4,200 such jobs exist in the St. Louis area and 321,000 nationally.  (Tr. 73-74.)

The ALJ then asked Dr. McGowan to assume the same individual, but that such a person was limited to sedentary work instead of light work.  Noting there to be no limitations given with respect to use of the hands, Dr. McGowan testified that such a person could perform the job of bonded semiconductors assembly, of which 5,900 such jobs exist in the St. Louis area and 472,900 nationally; packager/sealer, of which 1,100 such jobs exist in the St. Louis area and 50,000 nationally; and final assembly of optical goods, of which 1,160 such jobs exist in the St. Louis area and 288,000 nationally.  (Tr. 74-75.)

The ALJ then asked Dr. McGowan to assume an individual with a sit/stand option, "with some moving about, such that the person could only sit 30 minutes at a time before needed to move about, and could only stand for about 10 minutes at a time before needing to shift positions[.]"  (Tr. 75.)  The ALJ also asked Dr. McGowan to further assume the individual took daily naps at various times during the working hours.  Dr. McGowan testified that such a person could not perform any kind of work that exists in the national economy.  (Tr. 75.)

In response to questions by counsel, Dr. McGowan testified that all of the jobs previously cited require the individual to work with their arms extended away from their body.

- 8 -

Dr. McGowan testified that an individual who had limitations on the use of their arms for repetitive hand-action movements could not perform any sedentary work.  Dr. McGowan further testified that consideration of the use of a cane would not affect his testimony as to performance of the jobs previously cited.  (Tr. 75-76.)

### III.  Relevant Medical Evidence Before the ALJ

On September 2, 2004, the VA Medical Center issued elastic wrist support bands to plaintiff for complaints of wrist pain.  Plaintiff reported having the pain since 2002 but that the pain increased with lifting.  (Tr. 381-83.)

On June 28, 2005, plaintiff complained to staff at the VA Medical Center that he had bilateral wrist pain, especially at night.  (Tr. 454-57.)  X-rays taken of the wrists that same date yielded normal results.  (Tr. 320-21.)

On September 9, 2005, plaintiff visited Barnes Care with complaints of pain in his left elbow, right forearm, and bilateral hands as well as paresthesia of the left hand.  Daypro was prescribed and plaintiff was instructed to apply ice to the affected areas.  Plaintiff was instructed to return to work but with restrictions to no lifting/gripping/pulling over ten pounds and no shoveling.  (Tr. 279.)

Plaintiff visited Dr. David M. Brown of The Orthopedic Center of St. Louis on November 1, 2005, with complaints of worsening pain, throbbing, and numbness in his wrists and elbows.

- 9 -

Plaintiff reported the symptoms to have begun during the summer of 2004.  Examination showed good active range of motion about both elbows, wrists, and all digits of both hands.  Tenderness over the left elbow was noted.  Tinel's, Phalen's and Finkelstein's tests were negative.  Direct compression test induced some discomfort and paresthesias bilaterally.  Dr. Brown opined that plaintiff's symptoms were consistent with left lateral epicondylitis and a forearm brace was provided.  Dr. Brown recommended that plaintiff undergo nerve conduction studies regarding his remaining complaints and instructed that plaintiff wear wrist splints at night.  (Tr. 277-78.)

On November 4, 2005, plaintiff visited the VA Medical Center and complained of bilateral wrist pain.  Plaintiff was prescribed Gabepentin and Naproxen.  (Tr. 448.)

Nerve conduction and EMG studies performed at the VA Medical Center on November 9, 2005, yielded normal results. Evaluation for tendinitis/arthritis was recommended.  (Tr. 377, 621-22.)

Plaintiff underwent nerve conduction studies at the Neurological & Electrodiagnostic Institute on November 16, 2005, upon referral from Dr. Brown.  The results of the studies were normal and not impressive for carpal tunnel.  (Tr. 274-76.)

Plaintiff returned to Dr. Brown on November 28, 2005, who noted plaintiff's symptoms to have improved with negative testing

for cubital or carpal tunnel syndrome.  Good sensation was noted with no point tenderness.  Dr. Brown released plaintiff to full duty at work with no restrictions.  (Tr. 273.)

Physical examination at the VA Medical Center on March 29, 2006, showed good grip strength and good pulses bilaterally in the upper extremities.  Slight tenderness was noted over an area of the left wrist upon deep palpation where plaintiff reported he had a ganglion cyst, but Dr. Matthew McCall noted there to be no discernible growth or cyst.  (Tr. 390-93.)

Plaintiff returned to Dr. Brown on June 26, 2006, with complaints of worsening hand pain and numbness, radiating to the shoulders.  Physical examination was unremarkable and noted to be relatively benign.  Dr. Brown recommended that plaintiff undergo nerve conduction studies.  Plaintiff was released to full work duty with no restrictions.  (Tr. 272, 281.)

Nerve conduction studies performed July 12, 2006, showed mild left and very mild right median sensory neuropathies across the carpal tunnels.  (Tr. 269.)  On July 17, 2006, Dr. Brown diagnosed plaintiff with mild bilateral carpal tunnel syndrome and recommended that plaintiff wear wrist splints at night and take nonsteroidal anti-inflammatory medication.  Plaintiff was instructed to return in six weeks for follow up.  Plaintiff was released to full duty at work with no restrictions.  (Tr. 268.)

Plaintiff visited the VA Medical Center on October 26,

- 11 -

2006, and complained of burning, numbness and tingling.  It was noted that plaintiff increased his dosage of Gabapentin without obtaining results.  Laboratory testing was ordered.  (Tr. 361-64.)

Plaintiff returned to Dr. Brown on October 30, 2006, and reported having continued numbness and tingling in both hands with soreness about both elbows.  Tenderness and increased pain were noted with examination.  Dr. Brown diagnosed plaintiff with bilateral carpal tunnel syndrome that failed conservative treatment and opined that plaintiff was a candidate for carpal tunnel release.  Plaintiff indicated that he would like to proceed with the procedure.  Dr. Brown released plaintiff to full work duty with no restrictions.  (Tr. 266.)

Plaintiff underwent bilateral carpal tunnel release surgery on November 16 and 30, 2006.  (Tr.  263-65, 280.)

Plaintiff visited Dr. Brown on December 11, 2006, for follow up who noted plaintiff to be doing well.  Plaintiff reported having no numbness or tingling in either hand.  Dr. Brown instructed plaintiff to continue with a home therapy program.  Dr. Brown imposed lifting restrictions for work, and specifically that plaintiff be limited to lifting five pounds with the left arm and three pounds with the right arm.  (Tr. 261.)

On December 29, 2006, plaintiff reported to the VA Medical Center that his hands were doing better.  (Tr. 397.)

Plaintiff followed up with Dr. Brown on January 2, 2007,

- 12 -

who noted plaintiff to have done very well. Plaintiff reported
having no numbness or tingling in either hand. Dr. Brown
instructed plaintiff to continue with his home therapy program and
noted that no further treatment was necessary. Plaintiff was
released to work on full duty with no restrictions. (Tr. 259.)

Plaintiff visited the VA Medical Center on February 4,
2009, and reported decreased strength in his left hand. Plaintiff
denied any tingling or numbness down the arm. Plaintiff reported
that carpal tunnel surgery did not work. (Tr. 800.)

On July 20, 2009, plaintiff visited the VA Medical Center
and complained of cramps in his hands with sensitivity to the
carpal tunnel scar. Advanced practical nurse Pamela Becker-Weilitz
noted plaintiff's current medications to include Citalopram,
Gabapentin, HCTZ, Naproxen, and Nitroglycerin. No examination of
the hands was conducted and plaintiff was instructed to return in
four months. (Tr. 792-93.)

Plaintiff visited the VA Medical Center on December 30,
2009, and complained of having stiff hands that made it difficult
for him to grasp things. Plaintiff's medications were noted to
include Amitriptyline, Citalopram, Cyclobenzaprine, and Omeprazole.
Physical examination showed positive Phalen's and Tinel's tests
bilaterally. Nurse Becker-Weilitz opined that plaintiff's
condition was most likely carpal tunnel syndrome and instructed
plaintiff to obtain and wear wrist splints at night and to continue

- 13 -

with Naproxen.  (Tr. 788-90.)

Plaintiff visited the VA Medical Center on January 15, 2010, and was issued wrist splints and theraputty for home exercises.  Plaintiff complained that he experienced pain, numbness and tingling in his hands as he did before and that pain shoots through his hands causing him to drop things.  Plaintiff reported that use of wrist splints in the past was not helpful.  Physical examination was normal, showing full motor strength about the wrist extensors, wrist flexors and finger flexors.  Sensation was intact. Dr. Susy Alias diagnosed plaintiff with recurrent carpal tunnel syndrome with no signs of radiculopathy.  It was noted that EMG and nerve conduction studies would be considered if plaintiff showed no improvement in six months in order to rule out peripheral neuropathy.  (Tr. 733-38.)

On February 18, 2010, plaintiff underwent an independent medical examination for past injuries or medical conditions pertaining to the Second Injury Fund.  Physical examination showed weak forearms bilaterally, with strength measuring 4/5.  Sensory examination was normal.  Examination of the right elbow was normal. Examination of the left elbow elicited pain with palpation but with no radiating pain upon percussion of the ulnar nerve.  Examination of the wrists showed positive Phalen's and provocative testing bilaterally over the carpal tunnel.  Reverse Phalen's, Tinel's and Finkelstein's testings were negative.  Dexterity of the fingers was

- 14 -

intact.  Adduction and opposition of the right thumb was normal but was restricted on the left.  Grip and pinch strength was decreased on the left when compared to the right.  Ganglion cyst formation or triggering was not found.  Tests for carpal instability were negative.  Upon completion of the examination, Dr. David Volarich diagnosed plaintiff with overuse syndrome of the upper extremities, bilaterally, at the wrist causing median nerve entrapment (carpal tunnel syndrome) — status post open carpal tunnel release; and repetitive trauma left elbow causing lateral epicondylitis — not surgically repaired.  Dr. Volarich reported that plaintiff had ongoing pain, paresthesias and weakness in both hands.  Dr. Volarich opined that plaintiff should avoid using the hands in an awkward or blind fashion and should minimize repetitive gripping, pinching, squeezing, pushing, pulling, twisting, and rotary motions, as well as limit his use of the hands to "as needed."  Dr. Volarich further opined that plaintiff should avoid impact and vibratory trauma to the hands and should use appropriate braces, anti-vibration gloves, support straps, and other protective devices as needed.  Dr. Volarich further opined that plaintiff should not handle any weights greater than three pounds, particularly with the arms extended away from the body and should not handle weights in excess of fifteen pounds with arms close to the body.  Dr. Volarich advised plaintiff to continue a daily strengthening, stretching and range of motion exercise program for the hands.  (Tr. 240-54.)

- 15 -

Plaintiff returned to the VA Medical Center on April 26, 2010, and complained of continued pain in his hands and reported having trouble grasping and holding things.   Plaintiff was instructed to continue with Naproxen and to wear wrist splints at night.   Plaintiff was instructed to return in four months.   (Tr. 974-76.)  X-rays of the hands taken that same date yielded negative results.  (Tr. 904-05.)

On September 20, 2010, plaintiff reported to the VA Medical Center that his hand pain had improved.   Plaintiff's current medications were noted to include Amitriptyline, Buspirone, Citalopram, Cyclobenzaprine, Gabapentin, HCTZ, Hydrocodone, Naproxen, Nitroglycerin, and Omeprazole.  (Tr. 1164-66.)

Plaintiff visited the VA Medical Center on March 18, 2011, and complained of increasing cramping in the hands, pain in the hands and fingers, and numbness of the arms when he sleeps. Nurse Becker instructed plaintiff not to sleep with his arms over his head.  A referral to rheumatology was considered.  (Tr. 1200-02.)  X-rays taken of the right hand that same date suggested mild degenerative changes of the first metacarpophalangeal joint.   X-rays of the left hand yielded negative results.  (Tr. 1187-88.)

## IV.  The ALJ's Decision

The ALJ determined that plaintiff met the insured status requirements of the Social Security Act through December 31, 2011. The ALJ found that plaintiff had not engaged in substantial gainful

activity since December 31, 2006, the alleged onset date of disability.   The ALJ determined plaintiff's bilateral patellar tendinitis, degenerative joint disease in both knees, and pain disorder to constitute severe impairments, but that such impairments, either singly or in combination, did not meet or medically equal any listed impairment in 20 C.F.R, Part 404, Subpart P, App. 1.   The ALJ specifically found that the residual effects of plaintiff's carpal tunnel release surgeries and low back pain were not severe impairments.   The ALJ determined plaintiff to have the RFC to perform light work except that plaintiff could not climb stairs more than occasionally and could not do work requiring climbing ladders, ropes or scaffolding.   The ALJ determined that plaintiff could not perform his past relevant work.   Considering plaintiff's age, education, work experience, and RFC, the ALJ determined vocational expert testimony to support a finding that plaintiff could perform other work as it exists in significant numbers in the national economy, and specifically hospital products assembler, small parts assembler, and cashier.   The ALJ thus determined that plaintiff was not under a disability since the alleged onset date through the date of the decision.  (Tr. 10-23.)

## V.  Discussion

To be eligible for Social Security Disability Insurance Benefits under the Social Security Act, plaintiff must prove that he is disabled.  <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th

Cir. 2001); Baker v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. § 404.1520; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities. If the claimant's impairment(s) is not severe, then he is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or equals one of the

- 18 -

impairments listed in 20 C.F.R., Subpart P, Appendix 1.   If
claimant's impairment(s) is equivalent to one of the listed
impairments, he is conclusively disabled.  At the fourth step, the
Commissioner establishes whether the claimant can perform his past
relevant work.  If so, the claimant is not disabled.  Finally, the
Commissioner evaluates various factors to determine whether the
claimant is capable of performing any other work in the economy.
If not, the claimant is declared disabled and becomes entitled to
disability benefits.

       The decision of the Commissioner must be affirmed if it
is supported by substantial evidence on the record as a whole.   42
U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971);
Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002).  Substantial
evidence is less than a preponderance but enough that a reasonable
person would find it adequate to support the conclusion.  Johnson
v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).  This "substantial
evidence test," however, is "more than a mere search of the record
for evidence supporting the Commissioner's findings."  Coleman v.
Astrue, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks
and citation omitted).   "Substantial evidence on the record as a
whole . . . requires a more scrutinizing analysis."  Id. (internal
quotation marks and citations omitted).

       To determine whether the Commissioner's decision is
supported by substantial evidence on the record as a whole, the

- 19 -

Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the plaintiff's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision. Coleman, 498 F.3d at 770; Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." Weikert v. Sullivan, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation

- 20 -

marks and citation omitted); see also Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 977 (8th Cir. 2003).

As noted above, the ALJ specifically found at Step 2 of the sequential analysis that plaintiff's residuals of carpal tunnel release surgery did not constitute a severe impairment. Plaintiff claims that this determination was error, thereby rendering the resulting RFC determination to be flawed as well as the hypothetical question posed to the vocational expert. For the following reasons, plaintiff's argument is well taken.

At Step 2 of the sequential evaluation process, an ALJ determines the medical severity of a claimant's impairments. See 20 C.F.R. § 404.1520(a)(4). A severe impairment is one which significantly limits a claimant's physical or mental ability to perform basic work activities. 20 C.F.R. § 404.1520(c). "The impairment must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical . . . impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by the claimant's statement of symptoms." Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011). Although the claimant has "the burden of showing a severe impairment that significantly limit[s] [his] physical or mental ability to perform basic work activities, . . . the burden of a claimant at this stage of the analysis is not

- 21 -

great." <u>Caviness v. Massanari</u>, 250 F.3d 603, 605 (8th Cir. 2001).

Here, the record does not support the ALJ's conclusion that plaintiff's diagnosed condition of carpal tunnel syndrome did not constitute a severe impairment.  The record shows that, despite carpal tunnel release surgery in November 2006, plaintiff had a recurrence of symptoms in early 2009 which continued into 2011.  In December 2009 and February 2010, positive Tinel's and Phalen's tests suggested the recurrence of carpal tunnel syndrome, and indeed Dr. Alias rendered such a diagnosis in January 2010.  Although the ALJ acknowledges in his decision the January 2010 diagnosis of carpal tunnel syndrome, he wholly fails to acknowledge the positive clinical signs supporting the diagnosis and instead states that physical examinations were normal.  Such a conclusion demonstrates an incomplete review of the record.

In addition, the ALJ appeared to find it significant that plaintiff never underwent follow up EMG or nerve conduction studies in relation to his recurrent carpal tunnel syndrome.  However, the record shows that despite plaintiff's continued complaints of carpal tunnel symptoms within three months of his renewed diagnosis, the VA Medical Center did not refer plaintiff for such testing but instead instructed plaintiff to continue with his current treatment plan.  There is no evidence in the record explaining why the follow up electrodiagnostic testing did not take place nor did the ALJ question plaintiff at the administrative

- 22 -

hearing regarding this lack of follow up testing.  The ALJ retains the responsibility of developing a full and fair record in the non-adversarial administrative proceeding.  Hildebrand v. Barnhart, 302 F.3d 836, 838 (8th Cir. 2002).  If the ALJ believed that results of a repeat EMG and nerve conduction study were required to determine the severity of this diagnosed impairment, nothing precluded him from ordering the appropriate testing or permitting plaintiff to supplement the record with this information.  See 20 C.F.R. § 404.1517.  Indeed, "'[i]t is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision.'"  Freeman v. Apfel, 208 F.3d 687, 692 (8th Cir. 2000) (quoting Dozier v. Heckler, 754 F.2d 274, 276 (8th Cir. 1985)).

Finally, the ALJ determined to give great weight to the opinion of Dr. Brown whose last contact with plaintiff was in January 2007 when he released plaintiff to full work duty without restrictions subsequent to carpal tunnel release surgery.  However, an ALJ's disability determination must be based on what a claimant can and cannot do "at the time of the hearing."  Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995).  The administrative hearing here was held in May 2011 at which time the ALJ had before him substantial evidence regarding worsening symptoms, positive clinical findings, and indeed a diagnosis that plaintiff's carpal tunnel syndrome had recurred.  In these circumstances, to rely on

- 23 -

a January 2007 work release statement to find plaintiff's carpal tunnel syndrome not to be severe in May 2011 was error.  Id.  In addition, to the extent the ALJ was "unpersuaded" by the restrictions imposed by Dr. Volarich in his February 2010 report inasmuch as the report "was prepared for litigation purposes and a workers' compensation claim, not for purposes of treatment" (Tr. 20), such a reason provides an insufficient basis upon which to discount this examining physician's opinion.  Indeed, consulting examinations themselves are conducted in order to provide the Commissioner with evidence about a claimant's impairment to assist in the disability determination, and not for the purposes of treatment.  See 20 C.F.R. § 404.1517.

In light of the positive clinical tests demonstrating a recurrence of carpal tunnel syndrome, the affirmative diagnosis of such, and plaintiff's continued complaints of worsening symptoms, plaintiff has met the low threshold demonstrating that his diagnosed condition of carpal tunnel syndrome is a severe impairment.  Contra Martise, 641 F.3d at 924 (condition did not constitute severe impairment where the record was void of diagnostic testing, the claimant worked for several years with condition with no evidence that condition worsened, and condition responded to medication).  The ALJ therefore erred in failing to consider plaintiff's carpal tunnel syndrome not to be severe.  Because the ALJ removed from consideration the effects of

plaintiff's carpal tunnel syndrome and improperly weighed the medical evidence of record relating thereto, it cannot be said that the ALJ's RFC determination is supported by substantial evidence on the record as a whole.  This is especially true here where the RFC determination is silent as to any restrictions on plaintiff's use of his hands or upper extremities, and the vocational expert himself noted that such lack of restriction was significant to his testimony regarding plaintiff's ability to perform other work in the national economy.

Accordingly, substantial evidence on the record as a whole does not support the ALJ's decision, and this matter should be remanded to the Commissioner for further consideration of plaintiff's claims in light of all medical records on file and development of any additional facts as needed.  Upon remand, the Commissioner is free to consider any additional evidence offered by plaintiff and is not precluded from ordering a consultative examination with EMG and/or nerve conduction studies in order to assist in determining whether and to what extent plaintiff's carpal tunnel syndrome affects his ability to perform work related activities when considered in combination with his other impairments.

Therefore, for all of the foregoing reasons,

**IT IS HEREBY ORDERED** that Acting Commissioner of Social Security Carolyn W. Colvin is substituted for former Commissioner

- 25 -

Michael J. Astrue as defendant in this cause.

**IT IS FURTHER ORDERED** that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner is **REVERSED,** and this cause is **REMANDED** to the Commissioner for further proceedings consistent with this opinion.  Because the current record does not conclusively demonstrate that plaintiff is entitled to benefits, it would be inappropriate for the Court to award plaintiff such benefits at this time.

Judgment shall be entered accordingly.


_Frederick R. Buckles_

UNITED STATES MAGISTRATE JUDGE


Dated this  _26th_  day of September, 2013.

- 26 -